### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JORGE B.,

          Plaintiff,

          v.

Kilolo Kijakazi,
Acting Commissioner of Social Security,

          Defendant.

Case No. 19-CV-4738

Judge John Robert Blakey

### MEMORANDUM OPINION AND ORDER

Plaintiff Jorge B., who suffers from severe musculoskeletal issues from a car accident, seeks reversal under 42 U.S.C. § 405(g) of an administrative law judge's ("ALJ") determination that, despite his impairments, he is not disabled and thus ineligible for Social Security Disability Insurance (SSDI) benefits. Plaintiff seeks to reverse this decision, [8], and the Commissioner of Social Security moves for summary judgment to affirm, [15]. For the reasons explained below, the Court grants Plaintiff's motion [8] and denies the Commissioner's motion [15]. The Agency's decision is reversed and remanded for further proceedings consistent with this opinion.

### I.    Background

#### A.    Procedural History

On July 1, 2015, Plaintiff applied for disability insurance benefits, claiming that he became disabled on December 23, 2010 following a work-related car accident that caused numerous muscular-skeletal injuries, and that he suffers from diabetes,

stress and anxiety, all which render him unable to work. R. at 66–79. His claim was initially denied on September 22, 2015, *id.*, and upon reconsideration on April 7, 2016, R. at 80–95. Plaintiff appealed, and on January 17, 2018, ALJ Deborah Ellis found Plaintiff not disabled as defined under the Social Security Act ("SSA"), R. at 14–27. The Appeals Council denied review on May 20, 2019, R. at 1–6, making the ALJ's decision the final decision of the Commissioner for review, *see Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

### B. Medical Record Evidence

On November 29, 2010, a car rear-ended Plaintiff's car as he traveled to a property as part of his facility maintenance job with a property management company. R. at 352, 838, 864. Plaintiff received immediate treatment at an emergency room, R. at 352, and went home the same day in good condition, R. at 354, but MRIs revealed injuries to Plaintiff's right knee and left shoulder, R. at 343–46, and Plaintiff began complaining about back pain, R. at 345–46, 824–25. Then, in 2012, Plaintiff also began to suffer pain in his right hip, neck, and right shoulder, *see, e.g.*, R. at 551, 600, 753, 794, 824, 832, 864–65, and reported left hip and left knee pain, R. 712.

Regarding his right knee, a physician assistant, Ms. Cushman, diagnosed Plaintiff with a right knee medial meniscal tear and patellofemoral bone bruise and recommended surgery. R. at 835. In March 2011, Dr. Burra, an orthopedist, performed a "successful" surgery on Plaintiff's right knee. R. at 374–76, 600, 816.

2

Regarding his shoulders, Dr. Burra, diagnosed Plaintiff with a left shoulder SLAP lesion and bicep tendinitis, R. at 840, and performed a "successful" surgery on Plaintiff's left shoulder in August 2011, R. at 418, 600, although Plaintiff experienced recurring stiffness and residual pain despite physical therapy, R. at 642, 794–804, 811–23. In May 2012, however, Plaintiff reported significant improvement after receiving cortisone injections with only "very mild residual pain with overhead activity and no pain at rest." R. at 779. But he began to complain of right shoulder pain "exacerbated by compensating for deficits in his left shoulder." R. at 794.

An MRI of Plaintiff's right shoulder revealed a torn rotator cuff and bicep tendinitis for which he received another cortisone injection in May 2012. R. at 785–92. The cortisone injection did not provide significant relief, however, and Dr. Burra stated that, although Plaintiff may return to work from a left shoulder perspective, Plaintiff must now remain off work because of his right shoulder. R. at 792. Dr. Burra recommended that Plaintiff receive surgery for his right shoulder instead of additional cortisone injections because Plaintiff had diabetes and the injections elevated his blood sugar levels. *Id*. Yet, Plaintiff never received surgery for his right shoulder, telling Dr. Burra that he continued to wait for approval through his workers' compensation claim. R. at 774 (June 2012), R. at 769 (Sept. 2012), R. at 729 (Jan. 2013).[1]

---

[1] A January 29, 2013 medical record indicates that workers' compensation denied his right shoulder surgery request because the adjuster wrongly believed his right shoulder had not been imaged. R. at 729. Subsequent medical records show that workers' compensation formally denied Plaintiff's requested right shoulder surgery on August 7, 2013. R. at 722.

In June 2012, Plaintiff reported that physical therapy provided partial relief for his right shoulder and by October 2012, Plaintiff reported "tolerable" right shoulder pain but that movement and reaching overhead exacerbated the pain. R. at 744, 756. His doctor continued to recommend right shoulder surgery. *See*, *e.g.*, R. at 722, 759.

Between 2013 and 2015, Plaintiff's physical exams indicated that Plaintiff retained largely normal strength in both shoulders but consistently exhibited other issues on both sides, including pain when reaching overhead, forward flexion and rotator cuff pain, neck pain, and numbness radiating to his fingers. *See, e.g.,* R. at 722–25 (Nov. 2013), R. at 702–05 (Dec. 2013), 691–96 (Apr. 2014), 662–67 (Aug. 2014), 649–52 (Oct. 2014), 642–47 (Jan. 2015), 633–36 (Feb. 2015).

As for Plaintiff's right hip, in November 2012 Dr. Domb, another orthopedist, diagnosed Plaintiff with a labral tear; after conservative treatments with injections and physical therapy failed, R. at 748–49, Dr. Domb recommended surgery. R. at 717. In November 2013, Plaintiff also reported left hip and left knee pain. R. at 716. Plaintiff never had surgery on his right hip, however, telling Dr. Domb that he continued to await approval for surgery from his workers' compensation claim. R. at 705. Dr. Domb repeatedly suggested that Plaintiff pursue right hip surgery and left hip treatment through his wife's insurance. R. at 670 (July 2014), R. at 655 (Oct. 2014), R. at 639 (Feb. 2015).

Regarding his back, a 2011 MRI showed a disc bulge and some spondylosis (disc degeneration). R. at 818. Dr. Lorenz, a back specialist, recommended a

discogram (a test to evaluate back pain), but Plaintiff did not schedule it for over a year, telling Dr. Lorenz that he needed approval from his workers' compensation claim. R. at 766.

Finally, in September 2012, Plaintiff underwent a discogram, which showed highly concordant pain at L4-5 for which Dr. Lorenz recommended L4-5 spinal fusion surgery but also recommended that Plaintiff first address his right hip pain. R. at 708–09, 753. In April 2014, Dr. Lorenz referred Plaintiff for back pain management while he continued to wait for workers' compensation approval for his surgery, but he also did not pursue this. R. at 674, 699–700. In February 2015, Dr. Lorenz continued to recommend back surgery, but Plaintiff reported he still awaited workers' compensation approval. R. at 616–17.

In December 2016, after nearly two years without seeing any specialists for his back, hips, shoulders or knees, Plaintiff visited Dr. Lorenz and informed him that his workers' compensation case had settled and that he wished to pursue treatment for his back pain through his private insurance because "he is unable to live with this pain any longer." R. at 885. Dr. Lorenz, believing that Plaintiff's issues originated from "left knee and hip complaints," referred Plaintiff to hip and knee specialists for reevaluation and treatment before addressing Plaintiff's possible back issues. R. at 885. In December 2016, Plaintiff saw doctors regarding his left knee, R. at 1105–09, and an MRI revealed a meniscus tear among other problems, R. at 1092–04. In March 2017, Dr. Burra performed a left knee surgery, R. at 1086–87. Notably, Dr. Burra reported in February and July 2017 that Plaintiff had full range of motion in both

5

hips and no pain with rotary hip movements or "loading of the hips" even though Plaintiff never underwent the recommended hip surgery. R. at 1093.[2]

## C.   Work Clearance

From 2010 until early 2015, Plaintiff's orthopedists consistently told him that he could not return to his facilities maintenance job because of his musculoskeletal infirmities. *See, e.g.,* R at 619, 660, 700, 753, 767, 794. On February 17, 2015, at his orthopedist's recommendation, Plaintiff underwent a Functional Capacity Assessment ("FCA") conducted by Tyler Nohren, a Certified Athletic Trainer and KEY Assessment specialist. Mr. Nohren found, among other things, that Plaintiff could lift seventeen pounds over his shoulders occasionally and six pounds frequently; could not lift any weight from the floor to a chair; and exhibited increased pain in his back, right hip, knees, and both shoulders "with all lifting and tolerance activities.". R. at 876–77. Mr. Nohren also noted that Plaintiff could sit for 4–5 hours a day (60 minutes at a time) and stand 4 hours a day (50 minutes at a time). *Id.* Mr. Nohren concluded that Plaintiff could perform physical work at a modified, light level, but that his "workday tolerance is recommended at 5–6 hours due to his demonstrated limitations with sitting, standing, and walking activities." *Id.*

On February 19, 2015, Monica Strand, a Physician's Assistant to the treating orthopedists, also indicated that Plaintiff could return to modified light work with

---

[2] In addition to these numerous musculoskeletal issues, Plaintiff suffers from type 2 diabetes, obesity, sleep apnea, and anxiety. R. at 528, 546–47. The ALJ found non-severe impairments related to these conditions. Because Plaintiff does not seek reversal based upon any of these non-severe impairments, this Court does not address them here.

6

the following restrictions:  a 5–6 hour work day; lifting 20 pounds occasionally and 10 pounds frequently; sitting only 60 minutes and standing only 50 minutes at a time; walking occasional moderate distances; only squatting and kneeling occasionally; and only bending occasionally with position changes as needed.  R. at 625–26.

### D. State-Agency Experts

Three state-agency medical consultants opined about Plaintiff's musculoskeletal issues.  First, on September 5, 2015, Dr. Tinfang, a consultative examiner for the Bureau of Disability Determination Services, reviewed Plaintiff's medical records and examined Plaintiff for thirty minutes.  R. at 864–67.  Dr. Tinfang noted that Plaintiff reported right knee pain, left shoulder pain, neck pain and back pain; claimed physicians diagnosed him "with right hip fracture"; that he awaited back surgery approval; and that "he needs another shoulder surgery" but "is awaiting approval."  R. at 864–65.  Dr. Tinfang conducted a musculoskeletal assessment, noting, among other things, that Plaintiff got on and off the exam table with "no difficulty;" could walk more than fifty feet without support and with a normal gait; could perform toe/heel walk; could squat and stand on one foot; and had largely normal range of motion (except for some limitations in his spine and right knee), including "normal" range of the right shoulder; and normal strength in all limbs.  R. at 866.  Overall, Dr. Tinfang found Plaintiff suffered from chronic pain in the right knee, left shoulder, neck and back, as well as obesity, well controlled diabetes, and stable hyperlipidemia.  *Id*. at 867.

Second, on September 22, 2015, state-agency examiner Dr. Panepinto reviewed Plaintiff's medical records (but did not examine Plaintiff) to determine Plaintiff's medically determinable impairments (MDIs) and residual functional capacity (RFC) to work. R. at 71–78. Dr. Panepinto found Plaintiff had severe dysfunction of the major joints and DDD (disorders of back–discogenic and degenerative), as well as non-severe diabetes mellitus and hyperlipidemia. R. at 72. Regarding Plaintiff's claimed difficulties in walking and standing, Dr. Panepinto found Plaintiff only partially credible based upon Dr. Tinfang's findings that Plaintiff could squat and stand on each foot; got on and off the exam table without difficulty; had a normal gait; and could perform a heel/toe walk. R. at 73. Dr. Panepinto concluded that Plaintiff had an RFC for light work limited to lifting 20 pounds occasionally and 10 pounds frequently; standing or sitting for about six hours in an 8-hour workday; a limited ability to push and pull with his left upper extremity; and that Plaintiff could only occasionally climb ladders or stairs, balance, stoop, kneel, crouch, or crawl. R. at 74–75. In support, Dr. Panepinto cited Plaintiff's left shoulder MRI and surgery; right knee findings and surgery; inability to pass a straight leg raise (SLR) test; and disk herniation. *Id*. Although Dr. Panepinto noted Plaintiff's right shoulder lesion and partial rotator cuff tear, he later found an "unimpaired" right upper extremity and did not indicate the basis for this finding. R. at 75.

Third, state-agency examiner Dr. Surath also reviewed Plaintiff's medical files as part of his disability reconsideration. R. at 87–93. Dr. Surath concurred with Dr. Panepinto's findings about Plaintiff's musculoskeletal MDIs and RFC. *Id*.

### E.    Plaintiff's Evidence

Plaintiff testified before the ALJ but, seemingly due to language limitations, the ALJ often (and understandably) struggled to understand him.[3]  First, the ALJ confirmed that Plaintiff had not worked since his accident and asked Plaintiff why he did not seek treatment between February 2015 and December 2016.  As best the Court can understand,[4] Plaintiff explained that he continued to wait for surgery approval from his workers' compensation claim and his orthopedists told him to return once he received the approval.[5]  The ALJ also asked Plaintiff if his back pain affected his ability to function, and he responded, "I have to walk slowly. I can't seem—try to walk and I try to go by the side.  I say, no, I can't, because the pains in my back, they be worse."  R. at 51.  Finally, the ALJ asked Plaintiff about his daily

---

[3] An attorney represented Plaintiff at the ALJ hearing and, at his counsel's request, a Spanish interpreter also attended the hearing.  Confoundingly, despite Plaintiff's struggles to respond intelligibly in English, no one asked the interpreter to translate so that Plaintiff could respond to the questions in his native language.

[4] Specifically, Plaintiff responded:

> And the reason is I'm waiting for attorneys.  By the time I have all my—is this the one, this—what the doctor said—MRI, this the ones, X-rays—whether I need all this to say I need this, all these surgeries.  So I called up my attorneys and I let them know.  He said okay.  I'm waiting for you.  And by this time the same time that doctors—he say— I don't want you waiting your times with me, because you have like this much time that you coming to see me.  And you got all of the tests you needed to have this kind of surgeries and you need to talk to—with your attorney.  Also what are we waiting?  This approval.  And this is the reason, this day, this time, I call in.  I call him and I said no, we working.  No, we working right now.  We said, okay. So let me see.  What's going on?  And they called me.  I let it pass maybe by a month, two months.  They say please call me, what's going on.  Are you still waiting?

R. at 48.  The ALJ, confused, asked his counsel, "do you have any idea what he's talking about?"  *Id.*

[5] The record does not show whether the workers' compensation plan formally denied his back surgery request; and it remains unclear whether Plaintiff ever sought approval through his wife's insurance or if he thought he had such an option.  As discussed above, however, the records show that the workers' compensation plan formally denied Plaintiff's request for right shoulder surgery on August 7, 2013.  Plaintiff did not say (and the ALJ did not ask him) why he did not pursue right shoulder surgery through his wife's insurance.

activities and Plaintiff admitted that he does dishes and laundry, prepares meals, drives and even occasionally rides a bike to the park, uses a riding mower and takes walks.  R. at 52–54.  The ALJ did not ask Plaintiff any questions about his shoulder, hip or knee issues nor did the ALJ ask any other questions about Plaintiff's pain or functional limitations (associated with his back, or anything else).  Plaintiff's counsel asked Plaintiff a few questions about his pain and limitations, and he reported consistent pain.  R. at 56.

### F.    ALJ Decision

On January 17, 2018, the ALJ found Plaintiff not disabled after conducting the five-step sequential test set out in 20 C.F.R. § 404.1520(a)(4).  R. at 860–75.  This five-step test examines whether: (1) Plaintiff has performed any substantial gainful activity during the period for which claimant asserts disability; (2) Plaintiff has a severe MDI or combination of MDIs; (3) Plaintiff's impairment meets or equals any listed impairment; (4) Plaintiff retains the RFC to perform claimant's past relevant work; and (5) Plaintiff is able to perform any other work existing in significant numbers in the national economy.  *Id.*; *see also Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since November 2010 (Step 1), R. at 19; and had the following severe MDIs:  status post motor vehicle accident; degenerative disc disease of the lumbar spine; bilateral shoulder impairment; and right hip impairment (Step 2), *id.*; but that none of these MDIs met or equaled a listed impairment (Step 3), R. at 21.

Turning to Step 4, the ALJ concluded that Plaintiff could "perform light work" but that he could only "occasionally operate hand controls with left hand; occasionally reach, including overhead, to the left; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; avoid concentrated exposure to work at unprotected [*sic*] and moving mechanical parts and would be absent one day per month." R. at 21.

The ALJ found Plaintiff's subjective statements concerning the intensity, persistence and limiting effect of his symptoms "not entirely consistent with the medical evidence and other evidence in the record." R. at 22. Specifically, the ALJ found Plaintiff's ability to vacuum, put on shoes, drive and shop refuted his claimed disabling back pain. R. at 25. The ALJ also noted that, at the time of the September 2015 consultative exam with Dr. Tinfang, Plaintiff relied on only ibuprofen and naproxen to manage pain and that he failed to pursue any surgeries through his own insurance, which belied his claims of disabling pain. *Id.*

The ALJ also gave the state agency consultants' opinions great weight and afforded only "partial weight" to Mr. Nohren's February 2015 FCA findings because Mr. Nohren "was a therapist, not a physician." But the ALJ gave great weight to the February 2015 opinion of an "orthopedist" that Plaintiff could not lift more than twenty pounds, finding it consistent with his exams, strength tests and performance at the September 2015 consultative exam (as discussed below, this February 2015 "orthopedist" opinion is actually the opinion from the orthopedist's physician assistant, Ms. Strand). *Id.* The ALJ gave little weight to Plaintiff's hip specialist's

opinion that Plaintiff could only lift 10 pounds, finding it inconsistent with the medical records. *Id.*

Based on this RFC and the vocation expert's testimony, the ALJ determined that Plaintiff could not return to his past facilities management position because it constitutes heavy work (Step 4), but that he could perform light, unskilled jobs such as parking attendant, host, and order caller (Step 5). R. at 25–27.

## II. Legal Standard

An ALJ's findings of fact are "conclusive" as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). The "threshold for such evidentiary sufficiency is not high"; it "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Courts affirm an adequately supported benefits denial, even if reasonable minds could disagree about disability status, *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); but an ALJ must articulate a "logical bridge" from the medical evidence to the decision, *id.*; *see also Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). A court will remand a decision if it lacks evidentiary support or adequate discussion of the issues to form this requisite logical bridge. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

## III. Analysis

Plaintiff seeks reversal of the ALJ's decision on three grounds: the ALJ (1) failed to properly weigh competing medical opinion evidence; (2) improperly

discredited his subjective complaints of pain; and (3) made unsupported RFC findings that Plaintiff "would be absent one day per month" for pain and suffered no right shoulder limitations despite finding severe bilateral shoulder impairments. [8].

## A.    Opinion Evidence

Plaintiff complains that the ALJ failed to properly weigh competing medical opinion evidence because the ALJ: (1) improperly rejected Mr. Nohren's FCA opinion about a 5–6 hour workday limitation without properly analyzing it; (2) mistakenly found that the February 2015 opinion came from Plaintiff's "orthopedist" when it actually came from a physician assistant, Ms. Strand, and failed to recognized or acknowledge that Ms. Strand also recommended a 5–6 hour workday limitation; and (3) impermissibly gave the state agency consultants' opinions greater weight than Mr. Nohren's and Ms. Strand's opinions. [8] at 7–11.

20 C.F.R. 404.1527 provides the applicable rules to evaluate and weigh medical opinion evidence, although it distinguishes between treating "acceptable medical sources"; non-treating "acceptable medical sources"; and "not acceptable medical sources" or "nonmedical sources." Overall, regardless of the source, the ALJ "will always consider the medical opinions" together with all other "relevant evidence" in the record. 20 C.F.R. § 505.1527(b). The regulation sets out six factors that an ALJ *must* consider in weighing "acceptable medical source" opinions, § 404.1527(c), and *may* consider in weighing "not acceptable medical sources" or "nonmedical sources" depending "on the particular facts" of the case, § 4041.1527(f). The six factors consider: whether the source (1) examined or (2) has a treating relationship with the

plaintiff; (3) whether the source presents "relevant evidence to support" the opinion; (4) the opinion's consistency with other evidence; (5) whether the source has specialized medical knowledge; and (6) any other factors that may support or contradict the opinion including the source's understanding of the SSA's "disability programs and their evidentiary requirements." § 404.1527(c).

As to Mr. Nohren, 20 C.F.R. § 404.1502(a) provides a list of "acceptable medical sources," and it does not include physical therapists or personal trainers. Thus, pursuant to 4041.1527(f), the ALJ only needed to consider the above six factors depending "on the particular facts" of the case. The Seventh Circuit has held that the ALJ need only "minimally articulate its reason for discounting" a non-acceptable medical source so that the reader can "follow the adjudicator's reasoning." *Grotts v. Kijakazi*, 27 F.4th 1273 (7th Cir. 2022) (discussing application of § 404.1527(c) factors to non-acceptable medical sources); *see also Sosh v. Saul*, 818 F. Appx. 542, 547 (7th Cir. 2020) (finding no error where an ALJ "did not explicitly consider every factor listed under § 404.1527(c)" to evaluate a non-acceptable medical source).

Here, the ALJ only articulated one reason for partially rejecting Mr. Nohren's FCA opinion and specifically rejecting his 5–6 hour workday restriction: his status as a physical therapist. R. at 25. Although a physical therapist does not qualify as an "acceptable medical source," the ALJ did not explain why being a physical therapist alone renders incredible Mr. Nohren's 5–6 hour workday limitation in this case. Even if the ALJ did not need to consider all six factors applicable to acceptable medical sources, the rule requires that ALJ consider all medical opinions regardless

14

of their source. Exceptions would wholly swallow the rule if an ALJ could disregard a "not acceptable medical source" opinion simply because it comes from a "not acceptable medical source." The ALJ needed to offer more to allow the reader to follow the ALJ's line of reasoning.

Of course, if there existed no other support in the record for Mr. Nohren's opinion, then this issue may constitute harmless error. *Cf. Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (noting an ALJ's failure to support its findings may constitute harmless error "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record."). But the Court cannot find such harmless error here because, as Plaintiff points out, the ALJ assigned "great weight" to a February 2015 opinion by Plaintiff's "orthopedist," R. at 25, but ostensibly missed that this opinion also recommended a 5–6 hour workday limitation, R. at 625.[6]

The Commissioner insists that the ALJ reasonably discounted Mr. Nohren's opinion because it differed from the state-agency consultants' opinions. The ALJ did not offer this as a reason, however, and the Court must look at the reasons the ALJ gave rather than look for reasons why the ALJ "*might* have reached the same result had she considered all the evidence." *Spiva*, 628 F.3d at 353; *see also Phillips v. Astrue*, 413 Fed. Appx. 878, 883 (7th Cir. 2010) ("We confine our review to the reasons

---

[6] Plaintiff also complains that the ALJ incorrectly believed that "his orthopedist" rendered this opinion when, in fact, the orthopedist's physician assistant Ms. Strand offered it. Of course, the ALJ remained free to accept this opinion even if a physician assistant is a "not acceptable medical source", but the ALJ's mistake further indicates the need to reexamine this opinion before giving it "great weight."

offered by the ALJ and will not consider post-hoc rationalizations that the Commissioner provides to supplement the ALJ's assessment of the evidence.").

Further, the ALJ assigned "great weight" to the state-agency consultants' opinion finding their opinions consistent "with the exams." R. at 25. Yet, Mr. Nohren's FCA and the February 2015 opinion fall among the "exams" in the record and differ from the consultants' opinions at least with respect to the 5–6 hour workday limitation.[7] The ALJ did not acknowledge this inconsistency or how the consultants' opinions remain consistent with "the exams" in the record notwithstanding this explicit inconsistency.

Because of these inconsistencies and the issues noted above, the record does not "minimally articulate" the ALJ's reasons for discounting Mr. Nohren's opinion and crediting the state agency consultants' opinions with respect to the 5–6 hour limitation. *Grotts*, 27 F.4th at 1273. This does not constitute harmless error since Plaintiff would meet the definition of "disabled" if the ALJ finds that Plaintiff can only work 5–6 hours per day. *See* SSR 96-8p, 1996 WL 374184, at *2 ("RFC is the *maximum* remaining ability" to work "on a regular and continuing basis . . . mean[ing] 8 hours a day, for 5 days a week, or an equivalent work schedule"). Accordingly, remand is required.

---

[7] The state agency consultants also did not acknowledge or discuss the 5–6 hour workday restriction. *See* R. at 71–78, 87–93, 864–67.

### B. The ALJ Adequately Set Out Her Reasons for Discounting Plaintiff's Subjective Allegations

Plaintiff also alleges that the ALJ erred in evaluating his subjective allegations about the nature of his impairments. [8] at 13–16. An ALJ's evaluation of subjective symptoms must be "clearly articulated" to enable subsequent review and the analysis should focus on "whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *9. If so articulated, courts afford the credibility finding "'considerable deference,' and overturn it only if 'patently wrong.'" *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (quoting *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004)). A court will not "nitpick" a credibility analysis "for inconsistencies or contradictions," but will "give it a commonsensical reading." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th 2010).

The ALJ found Plaintiff's claims of disabling pain and functional limitations "not entirely consistent with the medical evidence and other evidence in the record" because: (1) his activities of daily living did not support them; (2) he reported at the September 2015 consultative exam that he relied on over-the-counter pain medications, instead of using narcotics; and (3) he failed to pursue recommended surgeries using his own insurance. R. at 24–25.

Plaintiff argues the ALJ erred in three ways. First, Plaintiff insists that his claimed disabling back pain remains consistent with his admitted activities, including doing chores, putting on his shoes, driving, and shopping. [8] at 13–14. He points to his claims that it took "most of the day to clean and dust the house" and that "he took rest breaks between chores." *Id*. at 14. Plaintiff's argument fails. Although

the Seventh Circuit has cautioned that a person's ability to perform certain activities "does not necessarily translate into an ability to work full-time," *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013), the ALJ did not find Plaintiff incredible based solely upon his admitted activities. Instead, the ALJ also pointed to his reliance on over-the counter medication and failure to seek surgery. Further, Plaintiff ignores his admission that he also rode his bike, could ride a riding lawn mower, and takes walks. R. at 52–54. Thus, the ALJ did not discredit his subjective pain claims based solely on his ability to perform household chores.

Second, Plaintiff argues that the medical records show he took narcotics in the past for his pain. [8] at 14. This argument also fails. The ALJ did not find Plaintiff had never taken narcotics; rather the ALJ found that, *at the time* he claimed to suffer disabling pain, he admitted that he only uses over-the-counter pain medication. R. at 25. This clearly articulates a reason to discount Plaintiff's claims and the ALJ's finding is not "patently wrong."

Third, Plaintiff argues the ALJ failed to adequately question Plaintiff as to why he did not pursue surgery through his wife's insurance. Plaintiff complains that the "record lacks evidence about whether his wife's insurance would cover the cost of the three surgeries or whether" Plaintiff "expected to eventually receive approval from workers' compensation." [8] at 16. This argument also fails. The ALJ did not ignore this subject during the hearing but pursued it from numerous angles. As discussed above, the Plaintiff offered some rather confusing answers (seemingly from a language barrier), but he acknowledged that he did not pursue the surgeries even

18

though he had used his wife surgery for his second knee surgery. In addition, while the record does not indicate whether his workers' compensation plan denied his requested back or hip surgeries, the record indicates the plan formally denied his requested right shoulder surgery on August 7, 2013. R. at 722. The record also shows that his orthopedist, Dr. Domb, repeatedly encouraged him to pursue hip surgery through his wife's insurance, R. at 591 (July 2014), 655 (Oct. 2014), 582 (Feb. 2015), but Plaintiff never did. All this evidence supports the ALJ's finding that Plaintiff "did not pursue these surgeries with his own insurance, as he was encouraged to." R. at 25.

Notably, *Plaintiff* bears the burden to submit records and evidence to support his claims. *See Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove the claim of disability."). He had a lawyer for the ALJ hearing and had the opportunity to supplement the evidentiary record, R. at 111 ("You can give the ALJ new evidence and bring people to testify for you."). He cannot complain that the ALJ did not consider theoretical evidence relating to requests through his wife's insurance (that may or may not exist) when he had the right and burden to submit such records for review. In addition, Plaintiff's legal counsel questioned him at the hearing and could have asked Plaintiff more questions about these surgeries. He did not. Overall, the ALJ clearly articulated the reasons for discounting Plaintiff's subjective claims of

disabling pain and Plaintiff has not established that the ALJ determination is "patently wrong."[8]

## C.    The ALJ's RFC Findings

### 1.    The ALJ Failed to Adequately Explain Why Plaintiff's Impairments Would Cause Him to Miss Work One Day Per Month

Next, Plaintiff complains that the ALJ failed to explain the RFC finding that he would need one absence per month for pain, as opposed to more days. [8] at 11. This matters because, as the Vocational Expert testified, employees "generally cannot miss more than one day a month." R. at 64.

SSR 96-8p requires that ALJs explain how they arrive at their conclusions regarding a claimant's RFC. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (citing SSR 96-8p, 1996 WL 374184, at *7 ("[The] RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts.")). Omission of such discussion "itself is sufficient to warrant reversal of the ALJ's decision." *Id*.

Here, the ALJ's finding of one absence per month only appears in a heading that summarizes the RFC findings, R. at 21. The ALJ does not discuss it elsewhere, except in a brief comment that the ALJ's RFC finding gives "absences for pain." R. at 24. The ALJ's failure to discuss the basis for the once-a-month absence finding

---

[8] Of course, the critical question under SSR 16-3p remains "whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." 2016 WL 1119029 at *6; *see also* 20 C.F.R. § 404.1529(c)(3). Since the Court reverses and remands the ALJ's decision for consideration of pertinent medical and opinion evidence as noted above, the ALJ remains free to revisit any credibility determination on remand if the ALJ believes that this additional medical and opinion evidence warrants it.

frustrates the Court's ability to review whether substantial evidence supports this finding. The ALJ does not explain why Plaintiff would miss one day per month because of pain (as opposed to more absences; no absences; shorter, more frequent absences; or whether some other limitation could account for pain). Nor does the ALJ's decision discuss elsewhere any evidence that may support a once monthly absence for pain. To the contrary, as discussed above, the ALJ partially discredited Plaintiff's claims about his debilitating pain. And the ALJ afforded great weight to the state-agency consultants' opinions who made no "once a month absence" finding for pain. Further, Mr. Nohren and Ms. Strand opined that Plaintiff could only work 5–6 hours per day because of his impairments, but the ALJ either rejected or did not consider those opinions. Regardless, neither of them gave a "once a month absence" limitation. Overall, the ALJ's decision does not set out a "logical bridge" between the evidence and the once monthly absence RFC finding. This missing analysis can be corrected on remand.

### 2. The ALJ Failed to Address Material Evidence Regarding Plaintiff's Right Shoulder Impairments

Finally, Plaintiff challenges the ALJ's RFC assessment that he had no right shoulder functional limitations, despite finding severe *bilateral* shoulder impairment at Step Two. [8] at 11–12. Instead, the ALJ found that Plaintiff's bilateral shoulder impairments only limited his left shoulder. R. at 21.

An ALJ must only point to sufficient evidence that "a reasonable mind might accept as adequate to support a conclusion" and this Court must affirm the decision even if "reasonable minds could differ concerning" the finding. *Burmester v. Berryhill*,

920 F.3d 507, 509 (7th Cir. 2019) (first quoting *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010), then *Elder*, 529 F.3d at 413).  Importantly, however, although "an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion" and in so doing, the ALJ "may not ignore entire lines of contrary evidence." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012).

Here, the ALJ acknowledged Plaintiff's complaints of "upper extremity radicular symptoms" in August 2014, R. at 23, and cited an October 2014 exam in which he reported "unchanged" pain, *id.*  Tracing the record back to the exam from which his pain remained unchanged, this means Plaintiff had right shoulder "burning" pain that radiated down to the elbow and worsened with overhead activity but lessened with rest and avoidance of triggering activities.  R. at 702.

The ALJ nonetheless found no functional limitations to his right shoulder, citing a February 2015 exam in which Plaintiff's orthopedist, Dr. Burra, noted "[a]ll inspectory findings were within normal limits . . . and [there was] only slightly reduced rotator cuff strength on the right." R. at 23.  The ALJ also cited Dr. Tinfang's consultative exam, which noted normal right shoulder range of motion, grip strength, and limb strength, R. at 25, and the state-agency consultant opinions of Drs. Panepinto and Surath, which both noted that Plaintiff's right upper extremity "is unimpaired." *Id.*

There exist some significant factual inaccuracies with the ALJ's analysis. Specifically, the ALJ failed to acknowledge that in 2013, Dr. Burra diagnosed Plaintiff with a right shoulder torn rotator cuff and lesion, and recommended surgery.

The ALJ also did not acknowledge that Dr. Burra's physical exams from 2013–2015 consistently noted that, even though Plaintiff retained normal strength in both shoulders, he exhibited various issues in both shoulder, including pain when reaching overhead, forward flexion and rotator cuff pain, neck pain, and numbness radiating to his finger. *See, e.g.,* R. at 722–25 (Nov. 2013), 702–05 (Dec. 2013), 691–96 (Apr. 2014), 662–67 (Aug. 2014), 649–52 (Oct. 2014). 642–47 (Jan. 2015), 633–36 (Feb. 2015).

The record suggests that the ALJ believed Plaintiff's right shoulder issues had improved over time and largely resolved by 2015. Specifically, the ALJ cites to Dr. Burra's February 2015 exam where he found that Plaintiff had "only slightly reduced rotator cuff strength on the right." But the ALJ ignored that Dr. Burra also noted right shoulder pain on forward flexion, tendon tenderness and abnormal results on a bevy of right shoulder tests. R. at 635. Further, the ALJ cited to a January 2015 report for the proposition that Plaintiff's right shoulder "has not sustained any new injuries" and "sensory was normal," but ignored that this report also notes right shoulder pain with forward flexion, abduction, and rotator cuff strength testing. R. at 642–47. The ALJ's analysis also ignored a February 2015 MRI that reconfirmed Plaintiff still had a right shoulder rotator cuff tear and SLAP lesion and found a "qualitative deterioration of the partial thickness tear" and "some progression as far as the extent of the involvement is concerned." R. at 635. And the analysis did not acknowledge Mr. Nohren's FCA recommendation of lifting and reaching restrictions on *both the* left and right upper extremities. R. at 877. This evidence confirms

23

limitations associated with Plaintiff's right shoulder impairment and does not support differentiating between his right and left shoulder impairments. Yet, the ALJ's analysis ignored this line of evidence.

Nevertheless, as the Commissioner correctly notes, [16] at 5, the ALJ also relied heavily on Dr. Tinfang's September 2015 consultative exam, which notes normal right shoulder range of motion, grip strength, and limb strength, R. at 22–24. Dr. Tinfang's report shows, however, that she mistakenly believed Plaintiff's surgeon had recommended a second surgery on his *left* shoulder where she wrote: "He underwent left shoulder surgery after the accident" but "the surgery was unsuccessful and he still has left shoulder pain because of tendon scar. He says he needs another shoulder surgery and is waiting for approval." R. at 864. Further, under "impressions," Dr. Tinfang notes "Left shoulder pain: chronic, pending approval for revision." R. at 867. As discussed above, however, the medical records do not support Dr. Tinfang's left shoulder "impression" of "pending approval for revision"; rather the medical records show Plaintiff awaited approval for *right* shoulder surgery. Notably, Dr. Tinfang does not list the medical records regarding Plaintiff's right shoulder among the materials she reviewed, R. at 864. This calls into question Dr. Tinfang's findings on Plaintiff's right shoulder and the ALJ's reliance on them (without discussion of the issues raised herein) undercuts the ALJ's RFC findings about Plaintiff's shoulder limitations.

As the Commissioner also notes, [16] at 5, the ALJ also relied on Drs. Panepinto and Surath. Unlike Dr. Tinfang, both Drs. Panepinto and Surath noted

24

that Plaintiff's orthopedist diagnosed him with a right rotator cuff tear and lesion; nonetheless, they also noted an "unimpaired" right arm. *Id.* (citing R. at 74, 91). But Drs. Panepinto and Surath clearly state they relied upon Dr. Tinfang's findings for this conclusion and their findings do not explain why Plaintiff's left shoulder condition warrants reaching limitations, but his right shoulder condition does not. R. at 75, 92.

Overall, the ALJ's analysis failed to acknowledge significant evidence indicating limitations associated with Plaintiff's right shoulder impairments. Obviously, the ALJ need not discuss every medical record, but the analysis may not ignore "highly pertinent" evidence in the record, *Parker*, 597 F.3d at 921, and must confront the evidence that "does not support" the ALJ's findings and "explain why it is rejected," *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Here, the ALJ decision does not include this requisite discussion. In ignoring entire lines of evidence and misconstruing others, the ALJ's analysis failed to build a logical bridge between the Step 2 finding of severe *bilateral* shoulder impairments and the Step 4 finding that these impairments limited Plaintiff's left shoulder functions but not his right. Based on the record, the Court also cannot find the error harmless, since the ALJ only asked the Vocational Expert about hypothetical left upper extremity movement restrictions, not bilateral upper extremity movement restrictions. The ALJ also did not ask Plaintiff about his subjective right shoulder limitations or otherwise elicit evidence during the hearing from which the vocational expert could learn of possible right shoulder impairments. *Cf. Murphy v. Colvin*, 759 F.3d 811, 820 (7th Cir. 2014)

("if the hypothetical posed to the VE does not include all the claimant's limitations, there must be some amount of evidence in the record indicating that the VE knew the extent of the claimant's limitations."). Accordingly, the Court also remands for reconsideration of the RFC finding about Plaintiff's right shoulder limitations.

## IV. Conclusion

For the reasons stated above, the Court grants the Plaintiff's request for reversal [8] and denies the Commissioner's motion for summary judgment, [15]. Pursuant to 42 U.S.C. § 405(g), the Court reverses the Commissioner's decision and remands the case for further proceedings consistent with this opinion. Civil case terminated.

Dated: May 27, 2022                     Entered:

John Robert Blakey
United States District Judge